**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

JOHN DOE,                                     *
                                              *
       Plaintiff          *   CIVIL ACTION NO. <u>21-364</u>
                                              *
v.                                            *
                                              *
THE ADMINISTRATORS OF THE TULANE              *
EDUCATIONAL   FUND,   d/b/a   TULANE          *   COMPLAINT
UNIVERSITY,                                   *   <u>AND JURY TRIAL DEMAND</u>
                                              *
       Defendant          *
                                              *
                                              *
*     *     *     *     *     *     *     *

## <u>COMPLAINT</u>

Plaintiff John Doe,[1] by and through his attorneys Nesenoff & Miltenberg, LLP, and Schonekas, Evans, McGoey & McEachin, LLC, as and for his Complaint, respectfully alleges as follows:

## <u>THE NATURE OF THIS ACTION</u>

1.     This case arises out of the actions and omissions of Defendant Administrators of the Tulane Educational Fund, d/b/a Tulane University ("Tulane" or the "University"), and its agents and/or employees, in connection with faulty and flawed disciplinary proceedings against Plaintiff John Doe, a former student at Tulane, and the sanctions Tulane imposed on Doe as a result of those faulty proceedings.

2.     After a fellow Tulane student, Jane Roe,[2] falsely accused John Doe of sexual assault, Tulane undertook an investigation and adjudication of the claims that materially and

---

[1] Plaintiff has filed simultaneously herewith a motion to proceed by pseudonym.

prejudicially deviated from its stated policies and procedures, breaching Tulane's obligations to John Doe as an enrolled student and violating the implied covenant of good faith and fair dealing inherent in all contractual relationships.

3.     By way of example, and not limitation:

    a.   Tulane failed to provide Plaintiff with timely and adequate notice of the charges against him;

    b.   Tulane failed to provide Plaintiff with timely and complete access to information during the investigation;

    c.   Tulane refused to disclose Jane Roe's original interview statement/summary, instead altering it numerous times over the course of several months in order to remove inconsistencies and maximize her credibility, then misleadingly back-dating it to her first interview date;

    d.   Tulane failed to disclose all witness statements to Plaintiff, despite his being entitled to them under Tulane's policies and federal law;

    e.   Tulane's investigators either negligently or deliberately altered certain witness statements to corroborate Jane Roe's claims where the witness did not actually do so, and, when this fact was brought to light, Tulane made no effort to correct or verify the substance of untested statements collected from multiple witnesses;

    f.   Tulane deprived Plaintiff of his right to an unbiased Hearing Board, instead putting on his Board a member of Tulane's sexual assault prevention team who had been deeply involved in reforming Tulane's policies to be more victim-centric, at the same time withholding this information about potential bias from Plaintiff;

    g.   Tulane denied Plaintiff his right to an impartial investigation and an unbiased Hearing Board by utilizing training materials for such individuals that bias investigators and hearing board members against an accused student, including by discouraging such participants from questioning inconsistencies or inaccuracies in the accusing student's account of events;

    h.   Tulane prevented Plaintiff from being able to question witnesses live at the hearing in direct contravention to the policies and procedures that Tulane claimed were applicable to the proceeding, and employed instead, without notice, a hybrid process that complied with neither the 2016-2017 Code of Conduct nor the revised 2017-2018 Code of Conduct;

---

[2] Roe is referred to herein pseudonymously.

i. Tulane's investigator *twice* instructed the Hearing Board members as to an incorrect standard for finding a student responsible for a policy violation;

j. on information and belief, Tulane failed to appropriately review and approve the Hearing Board's recommended sanction, in violation of Tulane's policies;

k. Tulane denied Plaintiff's appeal in a one-paragraph, rubber-stamp letter with no explanation and, on information and belief, without approval of the appropriate administrators; and

l. at all relevant times herein, Tulane appeared to be acting based upon a pre-determined presumption of Plaintiff's guilt and a desire to corroborate and support Jane Roe and to punish Plaintiff to the utmost regardless of the facts of the case.

4.     As a result of this flawed and inadequate process that materially deviated from Tulane's own procedures and obligations, Tulane reached an arbitrary, improper and unreliable outcome and unfairly expelled Plaintiff from Tulane, forever marring his educational records, impugning his reputation, and functionally precluding him from pursuing the career of his choice.

5.     Indeed, the outcome of Tulane's decision left Plaintiff with few options for continuing his education elsewhere and deprived him of the opportunity to earn a degree from Tulane.  Given the extremely damaging notation in Plaintiff's disciplinary record that he was found responsible for sexual assault, and expelled on that basis, Plaintiff was unable to transfer to a school of similar quality, which has already damaged his future educational and career opportunities and will continue to have a lasting negative impact.

6.     If Tulane's decision is not rectified, Plaintiff will continue to sustain damages, with a permanent notation on his educational records which will severely compromise his education and career prospects, including preventing him from gaining admission to graduate school or becoming a licensed professional.

7.      Plaintiff therefore brings this action to obtain relief based on Tulane's breach of contract and breach of the covenants of good faith and fair dealing.[3]  Specifically, Plaintiff seeks a permanent injunction vacating/voiding the finding and sanction reached in his disciplinary matter as the result of Tulane's failure to follow its procedures and governing law, and expunging Plaintiff's educational record related to such proceeding, as well as monetary damages.

## THE PARTIES

8.      John Doe is a natural person and resident of the State of Colorado.

9.      Upon information and belief, The Administrators of the Tulane Educational Fund is a non-profit educational corporation with a principal place of business at 6823 Saint Charles Avenue, New Orleans, Louisiana.

## JURISDICTION AND VENUE

10.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, because: (i) Plaintiff and Defendant are citizens of different states, and (ii) and the amount in controversy exceeds $75,000.00, exclusive of costs and interest.

11.     This Court has personal jurisdiction over Defendant on the grounds that Defendant is conducting business within the State of Louisiana.

12.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this judicial district.

---

[3] Plaintiff also pleads, in the alternative, detrimental reliance.

## FACTUAL ALLEGATIONS

**Plaintiff and Jane Roe**

13.     Plaintiff matriculated to Tulane in Fall 2015, with an anticipated graduation date of Spring 2019.

14.     On information and belief, Jane Roe also matriculated to Tulane in Fall 2015, with an anticipated graduation date of Spring 2019.

15.     In their sophomore year, Plaintiff and Roe lived on different floors of the same dorm and became acquainted through a mutual friend.

16.     In September 2016, Plaintiff and Roe engaged in consensual sexual activity on two occasions.  On the first night, September 23, 2016, Roe performed oral sex on Plaintiff.  The next night, on September 24, 2016, they engaged in consensual vaginal sex.

17.     On both occasions, Roe went to Plaintiff's dorm room, where they engaged in the consensual activities.

18.     On the second night, after they initially began having consensual intercourse, Roe told Plaintiff, "I don't think this is a good idea," upon which Plaintiff immediately withdrew his penis and ceased sexual intercourse.  Roe then began crying.

19.     Plaintiff asked Roe why she was crying.  She stated that she had been hurt before by a previous sexual partner who treated her as a one-night stand.  She also stated she was having some personal/family issues that were weighing on her mind.  She said nothing about not wanting to engage in intercourse.

20.     Plaintiff assured Roe that he was not like the previous partner that Roe was upset about.  Plaintiff and Roe spoke for about twenty minutes; Roe stopped crying and her concerns seemed to have subsided.

21.     During this time, Plaintiff and Roe both remained unclothed. Plaintiff and Roe then began kissing and again engaged in consensual sexual intercourse.

22.     During the intercourse, Jane Roe advised Plaintiff that it was beginning to hurt. Plaintiff immediately withdrew his penis and ceased sexual intercourse.  Plaintiff offered to retrieve lubricant to make Jane Roe more comfortable.

23.     Plaintiff then left his room and retrieved lubricant.  When Plaintiff returned to his room, Jane Roe was still in his bed.

24.     Plaintiff got back into bed with Jane Roe.  With Roe's consent, he applied the lubricant and the two then engaged in consensual intercourse for a third time.

25.     After they finished having sex, Roe got dressed (borrowing a shirt from Plaintiff, because her own top had several ties and was a hassle to put on), and Plaintiff walked her back to her room.

**Roe's Turnabout; Plaintiff's Pleadings**

26.     The next day, Plaintiff texted Roe to apologize for "whatever weirdness" occurred the night before.  Plaintiff was referring to Roe's sudden crying fit (over, according to her, unrelated issues), as well as the awkward start-stop nature of their sexual activities and his need to retrieve lubricant in the middle of their encounter.

27.     Although Plaintiff had requested and received affirmative consent from Roe for each instance of sexual intercourse, he had also perceived, in retrospect, that she did not seem to enjoy their encounter as much as he did, and for that, he of course felt bad.

28.     Roe responded by text and also apologized.  Specifically, she apologized for crying.  The two then set up a time to meet in person to discuss the prior evening.  Roe also

advised Plaintiff that she had washed his shirt for him and he could come pick it up when they spoke.

29.    On or about September 26, 2016, Plaintiff and Roe met in person and discussed their last sexual encounter.  At the beginning of the talk, both expressed some regrets and concluded they should not continue their sexual relationship.

30.    However, as the talk progressed, Roe's attitude toward their encounter changed; she went from expressing embarrassment and regret over her own actions to accusing Plaintiff of wrongdoing.  Roe demanded that Plaintiff apologize to Roe and she became increasingly agitated and accusatory towards him.

31.    Plaintiff tried to offer a general apology that Roe was unhappy about their encounter, but he was weary about being pressured into apologizing for something he did not do. Roe ended their discussion by threatening that if Plaintiff did not sufficiently apologize to her, she would "*turn this into* a sexual assault case."

32.    Over the next several months, Roe continued to demand that Plaintiff meet with her to discuss her feelings and to apologize to her. These demands for meetings continued into December 2016, while Plaintiff was trying to study for his final exams.

33.    Plaintiff did his best to appease Roe during this time, on occasion engaging with her demands and trying to offer the apology that he thought Roe wanted to hear, while at the same time growing increasingly concerned and frustrated with Roe's behavior.  From Plaintiff's perspective, there was simply nothing more to say, and he was struggling to deal with Roe in a manner that was true to reality, but would also satisfy her incessant demands.

34.     Eventually, during finals week in December 2016, Plaintiff told Roe that he could not continue to engage with her and that he did not know what else to tell her, as he had already apologized as much as he could.

35.     Plaintiff and Roe had no further communications after December 2016.

**Tulane's Investigation**

36.     Approximately five months after their consensual encounter, in February 2017, Roe contacted Meredith Smith, Tulane's Title IX Coordinator.  On information and belief, she did not identify Plaintiff or indicate that she wanted to make a formal complaint at that time.

37.     On information and belief, Ms. Smith referred Roe to Julia Broussard, Tulane's Assistant Director of Case Management and Victim Support Services.

38.     On February 3, 2017, Roe met with Julia Broussard. Roe asked about receiving certain accommodations, including academic accommodations. Roe stated she did not want to report anything to the police and was not really interested in filing a formal complaint via Tulane's conduct office.

39.     On information and belief, Roe asked Julia Broussard if Tulane could move another student out of her dorm (but did not identify Plaintiff specifically).  Julia Broussard responded that Tulane could not make anyone move unless Roe "engaged[d] with the conduct process"—in other words, Tulane would not act unless Roe pursued a formal complaint.

40.     Jane Roe still declined to pursue a complaint at that time.  Julia Broussard then informed Roe that she would call her in a few weeks to "check in."

41.     On May 9, 2017—nearly *eight months* after his brief interactions with Jane Roe— Plaintiff received a mutual "no contact order" (NCO) from Jessica Mullaly, a "conduct

investigator" at Tulane, prohibiting both he and Roe from having any direct or indirect contact with one another.  Tulane provided no information as to the basis or genesis of the NCO.

42.     Notwithstanding that Roe had apparently already had multiple meetings with the Office of Student Conduct and already informed the conduct office that she wanted to proceed with her complaint against Plaintiff, the NCO stated that the letter would be kept on file and made available to University personnel *"if* a grievance or student conduct complaint is filed by either party against the other party."

43.     The NCO further warned Plaintiff that even a violation of the order by a third party "may result in conduct charges against you" and that it was Plaintiff's responsibility "to appropriately notify any third parties of this agreement."

44.     Plaintiff, having not "agreed" to anything prior to receiving this letter, was perplexed.

45.     On May 10, 2017, Plaintiff received a notice from Vanessa Rodriguez, Tulane's Director of Student Conduct, stating:

> The student conduct office has received a report in reference to an incident that occurred in September 2016.  As a result, and in accordance with the Code of Conduct, you are being charged with the following: 1.III.E.2-Sexual Assault.

46.     The letter contained no information about who had made the report, the date of the alleged incident, the location, who the alleged victim was, or what the alleged conduct was that had resulted in the sexual assault charge.  While Plaintiff suspected the allegation was related to the NCO and Jane Roe, he had no information at all about what conduct he was actually being accused of or what the University was investigating, especially since he and Jane Roe had been together twice in September 2016 and engaged in several forms of sexual activity, ranging from kissing to oral sex and vaginal intercourse.

47.     On May 25, 2017, without receiving any more information from Tulane about what was going on, Plaintiff received a notice from Juan F. Gomez, a "Program Coordinator," stating that "as part of the conduct process at Tulane, you are required to meet with Vanessa Rodriguez, Director of Student Conduct."

48.     The notice acknowledged that the Spring semester had ended and Tulane was officially on summer break, yet still demanded that "your promptly [sic] attention to this matter is expected."

49.     On June 2, 2017, while out of the state on his summer vacation, Plaintiff attended a telephonic "procedural review" of the conduct process with Vanessa Rodriguez, despite still having received no substantive information whatsoever about the accusations or scope of the investigation.   At that time, Plaintiff was provided a document entitled, "The Hearing Board Process and Accused Student's Rights." *See* Exhibit "A" attached hereto.

50.     The document provided a list of rights that Tulane expressly guaranteed to student respondents in a sexual misconduct process.   Included in this list were the right to:

    a.   "receive notice of the charges accepted by the Student Conduct Administrator and the date of the hearing;"

    b.   "access the conduct file, including all statements submitted in the conduct proceeding;"

    c.   "be considered not to have violated the code until found in violation of the code after an opportunity to be heard;"

    d.   "appear and be heard at a hearing;"

    e.   "challenge hearing board members on the ground of personal bias;"

    f.   "have a complaint resolved without discrimination on account of . . . sex;" and

    g.   "question witnesses at the hearing through the University's Investigator at the Chair's discretion."

51.     While the respondent-facing version of this document contained a simple list of rights, Tulane's complainant-facing document entitled "The Hearing Board Process and Reported Victim/Complainant Rights", was considerably more detailed, organized, and proactive. *See* Exhibit "B" attached hereto.

52.     Indeed, the "victim's rights" document that Tulane provided to Jane Roe contained a detailed, step-by-step explanation of the hearing board process, including how to prepare and what to expect, provided contact information for support resources, and had a lengthy checklist of recommended steps for the "victim" at each phase of the process. The respondent-facing document contained no such information. *Compare* Exhibit "A" *with* Exhibit "B."

53.     Plaintiff was still not informed during the June 2, 2017 phone call for his "procedural review" with the Director of Student Conduct as to *what he was actually being accused of*, other than a generic statement that it was an allegation of "sexual assault," which, according to Tulane's policies, encompassed a wide range of activities.

54.     On or about June 5, 2017, Plaintiff was contacted by Jessica Mullaly, Tulane's assigned investigator, to set up an interview.  Again, Plaintiff was not informed of what exactly he stood accused of doing.

55.     Plaintiff advised Ms. Mullaly that he was trying to find an advisor and would need to postpone their interview until he could secure one.

56.     Unbeknownst to Plaintiff at the time, Tulane had already begun actively investigating the charges, despite that Plaintiff had yet to be interviewed to provide his side of the story.  In fact, Ms. Mullaly would go on to interview at least two witnesses before ever hearing from Plaintiff, begging the question of how an investigation can be thorough or impartial

when the investigator does not even bother to hear one party's testimony before interviewing purported witnesses.

57.     In or around June of 2017, Plaintiff retained a local attorney to serve as his advisor.

58.     In July 2017, Plaintiff provided Ms. Mullaly with a brief written statement concerning his interactions with Jane Roe in September 2016.  Jessica Mullaly then sent written questions to Plaintiff, and he promptly responded as best he could, given that it was his summer vacation, he *still* did not really know what the accusations were, and he was trying to recall details of events from ten months prior.

59.     Eventually, through this extended interview process, Plaintiff came to the understanding that, while Jane Roe acknowledged consenting to their entire first sexual encounter and most of their second sexual encounter, she alleged she did not consent to vaginal intercourse during the second encounter.

60.     On July 10, 2017, Plaintiff's advisor had a conversation with Vanessa Rodriguez concerning the disciplinary process, including inquiring as to what outcome Jane Roe was seeking from the process.  Ms. Rodriguez advised at that time that she was not aware of the resolution that Roe was seeking through the process.

61.     When Plaintiff's advisor asked about the possibility of an informal resolution, Ms. Rodriguez stated that she was "limited in resolutions outside a hearing board." Ms. Rodriguez implied that sexual misconduct cases were not eligible for informal resolution.

62.     On the same call, Plaintiff's advisor asked what policies and procedures would be applied to the conduct process, as Tulane had updated and significantly revised their sexual misconduct policies for the 2017-2018 school year, changing the entire process by which

allegations of misconduct were investigated and adjudicated.  Ms. Rodriguez advised that she did not know and would have to call him back.

63.     On July 11, 2017, Ms. Rodriguez told Plaintiff's advisor that Tulane would be applying the 2016-2017 conduct process and procedures to Plaintiff's disciplinary proceeding, even though new (and substantially different) procedures had already been put into place for the coming school year, via the 2017-2018 Code of Conduct.

64.     Contrary to what Ms. Rodriguez stated in her July 10, 2017 phone call with Plaintiff's advisor, the 2016-2017 Code of Conduct contains no prohibition on informal resolution for sexual misconduct cases.

65.     On or about July 28, 2017, Plaintiff's advisor had a telephone conversation with Jessica Mullaly.  In that call, Ms. Mullaly candidly expressed that Plaintiff might want to consider trying to withdraw from Tulane, as the Hearing Board process *consistently* resulted in guilty findings and expulsions of male respondents accused of sexual misconduct.

66.     On or about August 4, 2017, Plaintiff's advisor was notified that Jessica Mullaly was leaving Tulane, mid-investigation, and would no longer be involved with his conduct process.

67.     At that point, a new investigator, Dawn Broussard, took over.

**The Lead-Up to the Hearing**

68.     On September 1, 2017, Plaintiff was notified that Tulane had scheduled a conduct board hearing for September 18, 2017 concerning Roe's complaint against him.

69.     Notwithstanding the notice of hearing, Plaintiff would later discover that Tulane's new investigator, Dawn Broussard, was *still actively conducting witness interviews*, including

interviews and follow-up questions with four additional students identified in the waning days of the investigation, *after* this notice was issued and through September 13, 2017.

70.     On or about September 11, 2017, Investigator Broussard emailed Plaintiff with additional questions.  Plaintiff responded as best he could, within twenty-four hours, and further advised that he had additional information he would like to submit.

71.     Unbeknownst to Plaintiff at that time, Investigator Broussard conducted an interview with Jane Roe that same day.  No notes from that meeting were ever produced or provided to Plaintiff.

72.     On information and belief, in 2016 and 2017, it was Tulane's common practice for the Investigator to meet with a Title IX complainant for a "follow-up interview" shortly before the conduct board hearing.  Given the secrecy of these meetings, it appears they may have been used not for information-gathering, but rather, as an opportunity for Tulane to help complainants prepare for their hearings (eschewing any notion of impartiality).

73.     Notwithstanding that Investigator Broussard acknowledged receipt of Plaintiff's email stating he had additional information to submit, and that she did not advise Plaintiff of any specific deadline to submit it, Investigator Broussard "completed" her report (hereinafter, the "Hearing Board Report") and made it available to the Hearing Board on September 14, 2017, without the additional information Plaintiff had indicated he would provide.

74.     Moreover, as the investigation timeline would subsequently reveal, in the three days after Investigator Broussard interviewed Roe, Investigator Broussard took the statements of two new witnesses. On information and belief, Tulane interviewed these additional witnesses in an effort to bolster Roe's version of events and discredit Plaintiff's.  Then Investigator Broussard

14

simply wrapped up the investigation and completed the report without even waiting for the additional information that Plaintiff wished to provide.

75.     On or about September 14, 2017, Plaintiff was provided access to the Hearing Board Report drafted by Investigator Broussard.

76.     The Hearing Board Report indicated that Roe had given an initial statement to Jessica Mullaly on April 26, 2017; that Mullaly had sent Roe follow up questions on July 25, 2017 (after having received Plaintiff's written statement of events); that Roe submitted "corrections" to her prior statement on August 3, 2017; and that on September 11, 2017, Dawn Broussard met with Jane Roe in person for another interview.

77.     However, only a single "statement" by Jane Roe was included in Investigator Broussard's report (in addition to one email containing separate questions and answers).  The statement, which apparently incorporated all of the changes Roe made to her story over several months, was then misleadingly labeled and back-dated, "[Complainant] Statement, April 26, 2017" with no indication of what changes had been made, at what point, or at whose direction. No information was included indicating what "corrections" Roe had made to her statement in August 2017 or what had transpired in her interview with Investigator Broussard just days before the scheduled hearing.

78.     In other words, rather than providing an initial statement and then providing separate updates—which is how John Doe's statements were presented in the Hearing Board Packet—Tulane's investigator(s) carefully and deliberately harmonized all of Jane Roe's statements from her multiple interviews into a single document, **making it impossible for the Board, or Plaintiff, to assess how Jane Roe's story changed over time, or how her answers**

**to later questions may have conflicted with her original statement or may have changed in light of statements made in witness interviews**.

79.     When Plaintiff reached out to Tulane, objecting to Tulane's apparent withholding of Roe's original, un-doctored statement, Tulane's Vice President of Student Affairs responded, "if you are unhappy with the outcome of the hearing, you are welcome to raise the issue on appeal."

80.     In other words, not only was Tulane completely disinterested in making the process fair and equitable the first time around, it also presumed that Plaintiff would inevitably be found responsible by the Hearing Board (as Ms. Mullaly had previously advised Plaintiff was consistently the case with male respondents), and would then need to "appeal." Moreover, as Tulane was well-aware, the Code of Conduct provided only limited grounds for appeal with a standard of review that is highly deferential to the Hearing Board outcome, making it exceedingly rare that a problem arising during the investigation or adjudication process would be cured on appeal.

81.     Plaintiff also discovered, via the Hearing Board Report, that Investigator Broussard had permitted Roe to unilaterally select and curate certain submissions of her communications with Plaintiff.  Specifically, Roe submitted screenshots of certain messages with Plaintiff, from the time period during which Roe had become increasingly hostile to Plaintiff and Plaintiff sought to extricate himself from the situation, as purported evidence that Plaintiff had "confessed" to wrongdoing.

82.     On information and belief, the text messages were incomplete and were not in any way verified by Investigator Broussard.  In other words, Broussard did not ask Roe to produce her phone and show the original messages as they appeared in full, but rather, accepted

wholesale Roe's selected screenshots and presumed them to be full and accurate (and presented them as such).

83.     Notably, Roe did not produce the messages between herself and Plaintiff wherein she apologized to him immediately after their encounter, claiming that her phone broke and therefore she did not have them.  On information and belief, Broussard made no effort to investigate this claim either.

84.     Unfortunately, Plaintiff himself had deleted all of his messages with Roe when he finally cut ties with her in December 2016, and therefore, was left defenseless against Roe's curated production.  The Hearing Board would later rely heavily on Roe's unchecked and unverified submissions in supporting its decision, while largely disregarding Plaintiff's testimony concerning the same conversations.

85.     In light of the issues with the Hearing Board Report, and Plaintiff's retention of a new advisor to assist him at the hearing, on September 14, 2017, Plaintiff requested a brief adjournment of the hearing.

86.     On September 18, 2017 (the original hearing date), Tulane sent Plaintiff a re-scheduling notice for his hearing.  The September 18, 2017 letter advised that the hearing would now take place on September 26, 2017.  The letter also identified three new Hearing Board members.  These members were identified as: "Faculty-Dennis Kehoe; Staff- Alicia Domangue; Student – C.B."[4]  No other information was provided about these individuals.

87.     The September 18, 2017 letter advised that Plaintiff should submit anything he wanted to be included in the Hearing Board Report by September 19, 2017 at 5:00pm—in other words, within 24 hours.

---

[4] The student's full name was provided, but is abbreviated here for privacy purposes.

17

88.     Despite purportedly giving Plaintiff time to submit evidence to be included in the Hearing Board Report, Tulane then actually released the Hearing Board Report to the Hearing Board members before the September 19, 5:00pm deadline, and without the inclusion of additional information from Plaintiff.

89.     Plaintiff promptly objected to the premature release of the Hearing Board Report to the Hearing Board members before the deadline for his submission of relevant materials.

90.     Tulane's response, once again, was to tell Plaintiff that he could bring the issue up on appeal, again presuming that Plaintiff would be found responsible and putting no effort into giving him a fair and adequate process in the first place.

91.     When Plaintiff did timely submit his evidence on September 19, 2017, it was not provided to the Hearing Board members until two days later, and even then, it was simply posted as a separate "addendum" to the Packet—not incorporated back into his original statement, as Tulane had done with the various statements given by Roe.

92.     In anticipation of the hearing, and relying on Tulane's policy documents confirming the right to question witnesses at the hearing, Plaintiff had prepared questions for the complainant, as well as the six witnesses who were interviewed during the investigation and whose interview summaries (non-verbatim and written by the investigators) were included in the Hearing Board Packet as purported witness statements.

93.     However, in an abrupt about-face and in direct violation of its policies, Tulane informed Plaintiff just days before the hearing that *no witnesses* would be present.  Plaintiff was provided no explanation for this decision and no information on who made the decision and upon what grounds.

94.     Instead, Plaintiff was instructed to email his questions to Investigator Broussard, who would then email the questions *that she approved of* to the witnesses, and would let the witnesses respond to the questions in writing.

95.     Preventing the parties from being able to question the witnesses live at the hearing is in direct contravention of the process required by Tulane's 2016-2017 Code of Conduct, as well as the procedural rights documents upon which Plaintiff had relied throughout the process.

96.     However, the procedure of allowing accused students to question witnesses only through written questions, filtered through the investigator, with the responses provided in writing as the sole means of "cross-examination" *is* the process Tulane adopted in its 2017-2018 Code of Conduct. Accordingly, Tulane applied a hybrid, make-shift process to adjudicate the allegations asserted against Plaintiff that did not comport with the process mandated by either the 2016-2017 Code of Conduct or the 2017-2018 Code of Conduct.  Instead, Tulane unilaterally picked and chose what parts of what Code to apply and simply shrugged off all of Plaintiff's objections as nothing more than fodder for a later appeal.

97.     Notwithstanding Tulane's bad-faith refusal to permit Plaintiff to question the witnesses live at a hearing, where their credibility could be fairly assessed, Plaintiff complied with Tulane's instructions, submitting approximately 46 questions, in total, for the six witnesses, and nine questions for Jane Roe.

98.     Despite the fact that Tulane insisted on supplying the witness questions in writing and letting them submit non-simultaneous, written responses, ***Tulane <u>never</u> provided the witnesses' written responses to these questions to Plaintiff (nor the email from Investigator Broussard which would show how she worded the questions)***.  Nor were the witness responses

included in the Hearing Board Packet or as an addendum to the packet that was provided to the Hearing Board members.

99.     On Friday, September 22, 2017, Plaintiff unexpectedly received an email from Vanessa Rodriguez informing him that as of Thursday, September 21, 2017 (the day before), she would no longer serve as the Director of the Office of Student Conduct.

**The Hearing**

100.     Plaintiff's Student Conduct Hearing took place on September 26, 2017.

101.     The hearing started with the reading of the charges against Plaintiff.  Dawn Broussard, the investigator, instructed the Hearing Board as to the standard of evidence it was to apply in making a determination on the charges.

102.     In describing the standard of evidence, Investigator Broussard made a critical error that was never corrected.  She stated: "As a reminder to everyone present the burden of proof used in the university conduct system is preponderance of the evidence which means it is more likely than not that [Respondent] violated *or intended to* violate the Code of Student Conduct."

103.     However, that is ***not*** the standard of proof required by the 2016-2017 Code of Conduct, which instead states that "the evidence must establish that it was more likely than not that the student *committed* the alleged violation."  *See* Exhibit "C" (emphasis added).

104.     By including, in violation of the policy language and definitions contained in the operative documents, an alternative means for finding Plaintiff responsible—i.e., that he "intended" to violate the Code, regardless of whether he *actually* violated it or not—Investigator Broussard impermissibly skewed the process against Plaintiff, confusing the issue of what the

20

evidence must show by injecting a vague, subjective element separate from the parties' words and actions, and materially distorted the standard to be applied.

105.    Next, Jane Roe was permitted to make a statement to the Hearing Board, and to respond to questions.  For this portion of the proceeding, Plaintiff was not allowed in the hearing room, but was instructed to listen in via phone from a separate location.

106.    Investigator Broussard asked Roe only five questions.  These were described as initial questions submitted either by the responding student or by the Hearing Board, however, the questions did not include a single one of the nine questions that Plaintiff had previously submitted.  And, despite the fact that Plaintiff had been instructed to submit the questions in advance for approval, Plaintiff was never informed before the hearing date that any of his questions were not approved, nor given an opportunity to address whatever Investigator Broussard and/or Vanessa Rodriguez unilaterally determined as the basis for rejecting them.

107.    The Board members asked no questions to Jane Roe.

108.    Since all of his previous questions had been ignored, Plaintiff then submitted additional questions, during the hearing, for Jane Roe.  Investigator Broussard did ask some of these questions, but reworded them to alter the nature of the questions.

109.    Then, in the middle of asking Jane Roe Plaintiff's newly submitted questions, Investigator Broussard abruptly stated that she needed a break.  The recording that was being made for transcript purposes was paused during this break.

110.    After the break, the Hearing continued with Investigator Broussard asking Jane Roe a few more questions that Plaintiff had submitted.

111.    Next, it was Plaintiff's turn to speak.  He provided an opening statement and answered questions.

112.    At one point, Plaintiff raised the fact that none of his previously submitted questions had been asked of the Complainant—asking whether they were going to be asked at some later point.

113.    Vanessa Rodriguez, who served as the Chair of the Hearing Board notwithstanding her role in overseeing the investigation as the Director of Student Conduct or the fact that as of a few days before, she no longer had that job, stated that Plaintiff's questions had been screened out or "re-phrased" (apparently, so much so that Plaintiff could not even recognize them as his own), followed by repeating Tulane's response every time Plaintiff noted a problem with the process: "if you'd like to appeal on that basis, you may."

114.    Once again, Tulane openly expressed the assumption and pre-determined outcome that Plaintiff would be found responsible. The fact that this statement was made during the Hearing, in front of the Hearing Board members, by the Chair, is particularly troubling.

115.    Moreover, Ms. Rodriguez's dismissive statements and attitude throughout the investigation and adjudication are troubling because at all times relevant to this proceeding, she was Jessica Mullaly and Dawn Broussard's boss, and upon information and belief, Ms. Rodriguez was heavily involved in developing and conducting the training that each of the Hearing Board members received.

116.    After Plaintiff's question-and-answer portion was done, it was supposed to be the portion of the hearing devoted to questioning the witnesses.

117.    However, in violation of its policies, Tulane did not permit any witnesses to appear at the hearing.

118.    Instead of having the witnesses present to answer questions and give their testimony live, so that the Board could observe their credibility—as the process is supposed to

go—Investigator Broussard simply read out loud a handful of questions and what she purported to have been the witnesses' previously-submitted written responses (a claim that was unverifiable in light of Tulane's refusal to include the actual written questions or responses in the Hearing Board Packet or provide them to the Hearing Board or Plaintiff).

119.   The fact that the witnesses are supposed to appear live at the hearing for questioning is reflected in both the 2016-2017 Code and Tulane's procedural rights documents. For example, the 2016-2017 Code states: "A witness *will* attend the Hearing for their testimony only and will be excused after their testimony is complete."  *See* Exhibit "C." In addition, the procedural rights guaranteed to both the accused student and the complainant state that, not only are both parties entitled to identify witnesses to be interviewed by the investigator, but they are also entitled "[t]o question witnesses at the hearing through the University Investigator at the Chair's discretion." *See* Exhibits "A" and "B."

120.   Moreover, the importance of the witnesses appearing live at the hearing in order to answer follow-up questions from the Hearing Board or the parties and clarify any misstatements or confusion is evident from the Hearing Board process document provided to complainants detailing the process.  According to that document, Hearing Board members are supposed to affirm they have read the witness "statements" (which, in actuality, were summaries), then the witness is supposed to be asked if he/she has any clarifications, corrections, or additions; then questions submitted in advance are presented to the witness; then additional questions are permitted to be submitted.  *See* Exhibit "B."

121.   The Hearing Board process document further advises the student to "draft additional questions" *during the hearing*, unambiguously setting out the expectation that witnesses would appear at the hearing and be subjected to live questioning.

122.    Witnesses testifying live also enhances the reliability of their statements both because follow-up questions can be posed if a witness corrects or clarifies earlier statements given to the investigator, and because the Code mandates at the hearing that "[a]ll persons who provide testimony shall be asked to affirm that their testimony is truthful." *See* Exhibit "C."

123.    Here, despite the witnesses having responded in writing to the questions posed by Investigator Broussard, their written responses were withheld from Plaintiff in advance of the hearing and, indeed, were not even provided to Plaintiff or the Hearing Board at the hearing.

124.    Further, as Investigator Broussard was reading the witness questions and answers to the Board, it became evident that Investigator Broussard had again substantively altered Plaintiff's proposed questions to change their meaning.  For example, Plaintiff had submitted a question to each witness asking whether they had taken any steps to help Jane Roe report the alleged assault or get medical/legal help after she first described the incident to them.  This question was aimed at the discrepancy in the timeline, where Roe's witnesses had stated that she told them, in varying ways, about the alleged assault right away, yet Roe did not make any report to Tulane for over four months and did not decide to pursue any disciplinary action against Plaintiff for over seven months.  It would also indicate whether, at the time Roe first purportedly described her version of events, the witness perceived her story to be that of an assault, as opposed to simple regret over a consensual sexual encounter.

125.    Instead, Investigator Broussard materially altered this question, asking each witness whether Roe had *asked them for help* reporting.  This significantly changed the substance of the question.

126.    Once again, Plaintiff was never informed in advance that his questions had been rejected or altered, nor was Plaintiff given any opportunity to re-write his questions to address

any concerns that Tulane might have had with their phrasing.  They were simply discarded or changed at the whim of Investigator Broussard and/or Ms. Rodriguez.

127.    Incredibly, one of the facts that came to light during the reading of the witness questions and answers was the revelation that at least one witness "statement" in the Hearing Board Report contained a statement that purported to corroborate a specific factual claim by Jane Roe, *yet was never actually made by that witness***,** casting serious doubt on the reliability of all of the witness statements in the absence of live witnesses to affirm their accuracy to the Board, and raising serious questions of how and why an apparently completely fabricated statement containing a specific corroborating detail was inserted into a witness summary and presented to the Board as evidence in the Hearing Board Report.

128.    Specifically, in responding to a question that Plaintiff had posed about a specific factual allegation that was attributed to one of the witnesses in the Hearing Board Report, the witness's response was: "I think this one must be a mistake.  I didn't say that.  **I know nothing about [the statement].**  This is the first time I'm hearing of it."

129.    In other words, it became abundantly clear during the Hearing that the witness statements contained in the Hearing Board Report had not been adequately reviewed and confirmed as accurate by the witnesses, and in at least one situation, appeared to have been altered by Tulane specifically in a manner to corroborate Roe's story.

130.    Moreover, a review of the witness "statements" (which, again, are not direct statements from the witnesses, but rather, are summaries created by the Investigator) including in the Hearing Board Packet clearly revealed that either relevant information had been omitted from the summaries, or that the allegations had not been thoroughly investigated.  For example, the statement from Witness 1, who was one of Roe's roommates at the time of the incident, says

only with regard to her conversations with Roe about the incident that Roe told her that night that she had "hooked up with [Respondent] again" and "Witness 1 said that the next morning Complainant told her about the night before." There is no further information in the statement as to *what* Witness 1 said during her interview that Roe had told her about the incident, and no indication in the Hearing Board Packet that either investigator sent follow-up questions to Witness 1 to obtain this information. The failure to either ask a witness what Roe stated about the actual interaction with Plaintiff, or to gather that information and exclude it from the report, is a glaring omission, particularly considering how prominently the conversations that Roe claims to have had with Witness 1 about the incident feature in Roe's statement in the Hearing Board Report.

131.    Similarly, several of the statements from witnesses whom Roe identified as close friends with whom she confided about the incident actually never indicate that Roe said the sex was non-consensual, only that Roe was upset about the incident after the fact. Again, there is no indication that either investigator followed up with these witnesses to obtain further information or clarification as to how Roe had *actually described the events* that had occurred during the sexual encounter, as opposed to how she felt about it later. Considering that the Hearing Board ultimately concluded that Plaintiff and Roe had "very different recollections of the events in question" as to the central issue of whether Roe had consented to sex, the lack of follow-up by Investigator Broussard to ascertain *what* Roe had contemporaneously told her friends is egregiously negligent, if not deliberate. The inadequacy of the investigation was of course only exacerbated by the denial of Tulane's promised opportunity for meaningful cross-examination of witnesses.

132.    Despite these obvious omissions, coupled with Investigator Broussard reading out loud, to the Hearing Board, one witness's response that they never made a statement attributed to them in the Report, ***no Tulane employee made any effort to look into the matter further, consider whether the Report needed to be revised, or perhaps that it was important to hear from the witnesses live***, considering the discrepancies and reliability issues related to the witness statements.  Indeed, zero follow-up questions of any kind were asked by the Hearing Board.

133.    Incredibly, notwithstanding the lack of transparency as to what changes had been made to Roe's written statement and those of other witnesses, the demonstrable lack of reliability of the witness statements, and the clear failure to properly investigate (or deliberate refusal to disclose) what Roe has supposedly told the witnesses about the encounter itself, in the subsequent Hearing Board decision finding Plaintiff responsible for sexual assault, the Board would conclude that Roe's version of events was corroborated by the purported fact that her "recounting of the event remained sufficiently consistent."

134.    Obviously, it did not matter what was in the Report or what the witnesses said, because Plaintiff had already been prejudged as guilty, exactly as Ms. Mullaly had warned before being replaced.

135.    On information and belief, the Hearing Board members relied on the Investigator's slanted and inaccurate version of events as presented in the Hearing Board Packet, and placed little to no importance on actually testing the reliability of the statements, the credibility of the parties and witnesses, or the weight of the evidence, as they were obligated to do under the relevant policies.

136.    After Investigator Broussard's reading of the limited witness Q&A, Plaintiff and Jane Roe were given an opportunity to make closing statements. After that, Investigator

Broussard was invited to give a closing statement of her own, yet another procedural anomaly not called for anywhere in the relevant policies.

137.    Despite Investigator Broussard's dominant role during the hearing, neither Plaintiff nor the Hearing Board were given an opportunity to ask questions of Investigator Broussard, contrary to the provisions of the 2016-2017 Code, which states "the Investigator is present at the hearing to answer questions about their report to the board and the involved parties." *See* Exhibit "C."

138.    In her closing statement, which clearly put Investigator Broussard in the role of prosecutor, rather than impartial administrator, Investigator Broussard repeated that Plaintiff was being charged with sexual assault, and then stated, "as a reminder, the burden of proof used in the university conduct system is preponderance of the evidence which means the Board believes it is more likely than not that [John Doe] violated **or intended to violate** the code of student conduct."  Again, this was a false representation of the actual standard of proof necessary to find a policy violation.

139.    That was the last statement given to the Hearing Board before they deliberated – a completely incorrect explanation of the standard to be applied.

140.    The Board then deliberated briefly and found Plaintiff responsible for sexual assault.

141.    Plaintiff and Jane Roe were then permitted to submit impact/sanctioning statements before the sanction would be determined. Jane Roe requested expulsion.

142.    Plaintiff pointed out his complete lack of prior disciplinary history and his exemplary record of academic success and volunteering during his time at Tulane.  Plaintiff also pointed out that expulsion was not necessary given that Roe herself had willingly continued to

reside in the same dorm as Plaintiff for the remainder of the 2016-2017 school year, despite being advised that she could move or that Tulane could remove someone else if she filed a formal complaint, indicating that if Plaintiff and Roe could share a dorm for the entire academic year after which the alleged assault occurred, then the two sharing Tulane's large campus going forward should not present significant reason for concern.

143.   Plaintiff and Jane Roe were then dismissed and told the sanction decision would be issued in a few days.

**The Sanction**

144.   On October 2, 2017, Investigator Broussard notified Plaintiff that the Board had found him responsible for sexual assault and recommended expulsion. The notification letter contained no explanation or rationale whatsoever for the finding or the sanction.  Despite providing no real information about the decision-making process, the letter gave Plaintiff only one week to submit an appeal.

145.   Plaintiff then had to chase Tulane for days to get it to provide the written rationale behind the decision and relevant materials from the hearing, including the transcripts, to which he was entitled in the first place under Tulane's policies and applicable federal regulations.

146.   Eventually, Tulane provided a copy of what purported to be a decision letter (hereinafter, "the Decision Letter").  While the document contained signature lines for each member of the Hearing Board, along with the Chair, all signature lines were blank, and the document was undated, raising serious questions as to whether the Board even drafted the rationale themselves or actually voted by a majority to find Plaintiff responsible.

147.   The supposed rationale for the Board's finding of responsibility set forth in the Decision Letter lacked evidentiary support in the record.

148.    In explaining the basis for imposing the sanction of expulsion—the harshest sanction possible—the Decision Letter made clear that Plaintiff's insistence on his innocence was viewed as an aggravating factor that indicated a "lack of empathy" such that an educational intervention would not be effective, and therefore, he needed to be removed from the community.

149.    This is an extremely problematic line of reasoning: apparently, a respondent who admits to committing a sexual assault would be more welcome on campus than one who maintains his innocence.

150.    It is also problematic because it functionally punishes respondents for exercising their right to dispute the charges under Tulane's policies—effectively, it is retaliation against respondents who dare to defend themselves.

151.    On information and belief, Tulane specifically trained its Hearing Board members to view a respondent's claim of innocence as an aggravating factor for sanctioning purposes.

152.    The sanction also was not proportionate to the alleged violation, given the opacity of what had transpired between Plaintiff and Roe during the incident.  The Hearing Board further appeared to have only considered how the sanction of expulsion would affect Roe, with no consideration given to the impact of separating John Doe from his education, contrary to federal guidelines which had been issued prior to the hearing.

153.    Moreover, the Decision Letter did not appear to indicate that the Board's recommendation for the sanction was reviewed or approved by the appropriate administrator(s) as required by Tulane's policies. Plaintiff received no further communication from Tulane as to whether the recommended sanction had been reviewed or approved, when, or by whom.

**Plaintiff's Appeal**

154.    On October 23, 2017, Plaintiff submitted an appeal from the decision finding him responsible for sexual assault, as well as the sanction of expulsion.

155.    In his eleven-page appeal, Plaintiff painstakingly outlined the procedural and substantive issues that had plagued the investigation and adjudication process, including, but not limited to: Tulane's refusal to provide Plaintiff with a complete investigation record (by, for example, withholding Jane Roe's original statement and all of the final witness statements); Tulane's failure to permit Plaintiff to question the witnesses live at the Hearing; Tulane's failure to follow its Hearing protocols; and the excessive, arbitrary, and capricious nature of the sanction.

156.    On November 14, 2017, Tulane notified Plaintiff that his appeal was denied.

157.    The appeal denial letter was signed by a "Student Conduct Investigator," rather than an appropriate University administrator.

158.    Moreover, the appeal denial letter provided no explanation or reasoning for the decision.  It merely stated: "After reviewing all the relevant information, including your appeal documents, the board determined that your appeal did not have merit."  With this, the decision was final and the expulsion sanction was to go into effect immediately.

159.    The appeal denial letter never identified the members of the board who purportedly heard Plaintiff's appeal, nor gave him any opportunity to object on the basis of bias or conflict.  Tulane's refusal to identify the members of the Appeal Board further prevented Plaintiff from confirming that Tulane abided by its policy prohibiting the involvement on appeal of anyone who had been a member of the original Hearing Board (as Tulane's Hearing Board

members and its Appeal Board members were, according to Tulane's policy documents, drawn from the same overall pool of individuals).

160.    In addition to Tulane's appeal decision being an opaque, rubber-stamp process seemingly carried out by improper employees, Tulane's failure to provide the rationale for the appeal decision violated the edicts of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act ("Clery Act"), 20 U.S.C. § 1092 et seq., and its associated regulations.

161.    Specifically, the Clery Act regulations mandate that a "prompt, fair, and impartial" proceeding includes notification in writing to the accused of the results of any initial, interim, and final decision to resolve a sexual misconduct disciplinary matter, and that "the result must also include the rationale for the result." 34 CFR 668.46(k).

162.    With his appeal denied, Plaintiff has exhausted his administrative remedies and this lawsuit now represents his only option for redress.

**Agreements, Representations, Covenants and Warranties Between Plaintiff and Tulane**

163.    Upon Plaintiff's matriculation to Tulane, the University provided him with copies of its policies, including but not limited to the Tulane University Code of Student Conduct (the "Code" or the "Code of Conduct").[5]

164.    The Code, along with Tulane's other student-facing policies and publications concerning its disciplinary processes (such as the various "Hearing Board Process" and student rights documents), comprise express and implied promises from Tulane to its students, including

---

[5] Because Tulane purportedly applied the 2016-2017 Code to Plaintiff's case, that version of the Code is referenced here. *See* Exhibit "C."

Plaintiff, with regard to how it will address and adjudicate complaints of sexual misconduct. *See* Exhibits "A" and "B" and "C."

165.   The Code confers upon students, including Plaintiff, certain rights and responsibilities, and provides certain procedures by which the University must adjudicate alleged Code violations depending upon the nature of the violation and the possible sanction(s) associated with the violation.

166.   Tulane repeatedly, materially, and prejudicially violated the Code and its other published policies and procedures when investigating and adjudicating Jane Roe's complaint against Plaintiff, resulting in an unreliable finding and an arbitrary, capricious, and excessive sanction.

167.   By way of example, and not limitation, Tulane violated the Code in the following material ways:

   a.   The Code guarantees an "Impartial Board" and advises that Hearing Board members should disqualify themselves from serving on a hearing board if there is an issue of personal bias.  *See* Exhibit "C." However, Faculty Member Dennis Kehoe—who, unbeknownst and undisclosed to Plaintiff, had served on Tulane's Sexual Violence Prevention and Education Commission—never disclosed his personal bias, which favored complainants and disfavored respondents, particularly in sexual misconduct proceedings, and further, Mr. Kehoe did not recuse himself.

   b.    The Code guarantees an "Impartial Board," yet Plaintiff's Hearing Board was not impartial because it was chaired by the Director of Student Conduct who, on information and belief, was directly involved in the investigation phase, including making decisions regarding which witnesses to interview and what questions to ask them, and in drafting the various investigation and hearing-related documents throughout the disciplinary process.

   c.   The Code guarantees an "Impartial Board", yet on information and belief, Tulane trained its Hearing Board members using biased training materials and methods that heavily favor complainants and disfavor respondents, especially in cases involving allegations of sexual misconduct, including by discouraging Hearing Board members from questioning inconsistencies in a complainant's version of events and viewing inconsistent statements or acts by a complainant as a result of

"trauma", thereby imbuing the very evaluation process with a presumption that an assault occurred.

d.   The Code promises the conduct process to be "a non-adversarial approach to resolving allegations." *See* Exhibit "C." However, every time Plaintiff noted an issue throughout the process, Tulane would disregard his concerns and advise him to appeal the decision later.  Tulane's cavalier attitude towards mistakes and flaws in its processes and its consistent refrain to Plaintiff to appeal its multiple failures after-the-fact (when the burden would be on Plaintiff and the grounds for appeal were strictly circumscribed) was highly adversarial, pitting Plaintiff not only against Jane Roe, but against Tulane itself.

e.   The Code promises the conduct process to be "a non-adversarial approach to resolving allegations." *See* Exhibit "C." However, when a respondent appeals a finding and sanction on procedural grounds, as Plaintiff did here, the Code permits the Student Conduct Administrator or designee to "provide any information or documentation relevant to that claim," which is not disclosed to the respondent.  On information and belief, that practice results in University officials submitting responses defending the process and arguing that no procedural errors occurred, effectively pitting them directly against the respondent, in this case, the Plaintiff.

f.   The Code provides that the investigator will conduct "an impartial and thorough investigation." *See* Exhibit "C." Tulane's investigators, by *repeatedly* revising Jane Roe's statement to incorporate new information and, presumably, remove inconsistencies, tainted the entire process in favor of Jane Roe and against Plaintiff and precluded Plaintiff from being able to effectively question Jane Roe, and precluded the Hearing Board from accurately assessing her credibility. Similarly, the lack of follow-up to obtain additional information from students with possible knowledge of how Roe described the incident contemporaneously combined with the incomplete, and at times misleading, way that witness statements were disclosed to Plaintiff and the Hearing Board shows the investigation was not thorough and was not impartial.

g.   The Code provides that "the investigator is present at the hearing to answer questions about their report to the board and the involved parties." *See* Exhibit "C." However, not only was the original investigator, Jessica Mullaly, not present at the hearing at all, neither Plaintiff nor the Board were given any opportunity to ask the second investigator, Dawn Broussard, questions about the report.  This violation is particularly egregious considering the extensive irregularities and complainant-favored alterations Broussard and/or Mullaly made to the Hearing Board Report.

h.   The Code provides that, "the responding student and the complainant shall be offered the opportunity to identify their own witnesses and to question one another's witnesses through the University investigator and at the Chair's

discretion…[T]he investigator will request that members of the University community with relevant information attend the hearing, if feasible." *See* Exhibit C." On information and belief, Investigator Broussard never even bothered to request that the witnesses attend the hearing, and by all outward appearances, Tulane went out of its way to preclude Plaintiff from being able to question witnesses at the hearing, unilaterally announcing just days before the hearing that no witnesses would appear live, and Plaintiff's only ability to pose any questions of witnesses would be in writing, through the investigator, with the witnesses responding in writing (but with Tulane knowingly and deliberately withholding those written witness responses).    Further, despite Plaintiff submitting his proposed witness questions in advance of the hearing, many of his questions were either disregarded altogether or materially altered, without any notice to Plaintiff or opportunity to cure. This process, which bore no relationship to the 2016-2017 Code or any of the procedural rights documents provided throughout the proceeding, deprived Plaintiff of the right to question witnesses in any effective or meaningful way.

i.  The Code provides that at the hearing "all persons who provide testimony shall be asked to affirm that their testimony is truthful." *See* Exhibit "C." Jane Roe, the only "witness" who was present at the hearing, was never asked to affirm her testimony was truthful.

j.  The Code provides that hearing board decisions concerning sanctions "are recommendations to the Vice President for Student Affairs, or designated representative. Recommended sanctions may be approved, altered, deferred or withheld at the discretion of the responsible University official…All sanctions involving cases of sexual and/or gender-based misconduct will also be reviewed by the Title IX Coordinator prior to the Vice President for Student Affairs making a determination." *See* Exhibit "C." On information and belief, Tulane failed to apply the proper vetting and approval process for the Board's recommended sanctions against Plaintiff.  The only document provided to Plaintiff concerning his sanction was the unsigned, undated Hearing Board recommendation, and the final appeal denial letter issued by one of Tulane's investigators.

k.  If Tulane did provide the vetting and approval process for the sanction that the Code requires, Tulane's lack of transparency nevertheless deprived Plaintiff of the ability to confirm whether Tulane followed the process in order to know whether to challenge the sanction on that basis on appeal. Further, on information and belief, the Title IX Coordinator tasked with reviewing and approving the severity of the sanction is also directly involved with the investigation and drafting the investigation report and Hearing Board Report; therefore, the appearance of an impartial second-level review of sanctions is largely a mirage, further calling the neutrality and impartiality of Tulane's process into question.

l.  According to the Code, "Appellate panel members may not review a case for which they were on the original [hearing] Board." *See* Exhibit "C." Tulane

improperly withheld the identities of Plaintiff's Appellate panel members, making it impossible for him to (1) challenge any member for bias, or (2) ensure that the appellate panel was properly constituted.

m. The Code promises student respondents an "impartial Board" as well as an "impartial" investigation. However, Similar to the problematic nature of the Director of Student Conduct participating in the investigation and then chairing the Hearing Board, and the Title IX Coordinator participating in the investigation and then weighing in on the sanction determination, on information and belief, Tulane's practice at the time was for the Director of the Office of Student Conduct or a similarly-situated senior administrative official who personally participated in the investigation and adjudication process, to serve as the Chair of the appellate panel. Moreover, when an appeal alleges that procedural error occurred in the underlying process, the Office of Student Conduct is allowed to submit information to the appellate panel that disputes the validity of the claimed error, which information is never disclosed to the student. Such an arrangement clearly undermines the legitimacy and impartiality of the appeals process, and here, nothing was disclosed to Plaintiff regarding who was participating in the appeals process or in what capacity they were participating.

168.   In addition, pursuant to Tulane's "Hearing Board Process and Accused Student Rights" document, which was provided to Plaintiff by Tulane during Tulane's investigation, "a student charged with a violation of the Code of Student Conduct is entitled to procedural protections under the Code, including the right:"

a. "To access the conduct file, including *all statements* submitted in the conduct proceeding;"

b. "To challenge hearing board members on the ground of personal bias;"

c. "To question witnesses *at the hearing* through the University's Investigator at the Chair's discretion*;*"

d. "To receive written notice of charges accepted by the Student Conduct Administrator;" and

e. "To be considered not to have violated the Code until found in violation of the Code after an opportunity to be heard."

*See* Exhibit "A."

169.    Tulane violated both the letter and the spirit of these promises and procedural protections, because, among other things:

a.    Tulane not only failed to provide Plaintiff with a copy of Jane Roe's original interview with the investigator, or any information about what transpired during Roe's subsequent interview with Investigator Broussard, but it *deliberately refused* to do so, even after being advised of this issue by Plaintiff before the hearing. Tulane also refused to disclose the written responses of the witnesses to the questions submitted by Investigator Broussard, despite the fact that such written statements were available before the hearing. In that regard, Tulane violated the promise to provide access to the full conduct file, which specifically includes the right to access all statements submitted during the conduct process, and prevented Plaintiff from being able to fully present his defense.

b.    Tulane, by failing to disclose Hearing Board member Dennis Kehoe's direct involvement in Tulane's sexual assault prevention task force, which is specifically centered on the prevalence of sexual violence on college campuses and the importance of believing those who report being the victim of sexual misconduct, precluded Plaintiff from being able to assess Mr. Kehoe's potential for bias. On information and belief, nothing on Mr. Kehoe's faculty webpage indicated his involvement with this group, thereby making it highly unlikely that Plaintiff could uncover this conflict on his own. Undoubtedly, both Tulane and Mr. Kehoe were aware of this potential conflict yet withheld the information and Kehoe did not recuse himself.

c.    Tulane prevented Plaintiff from being able to question witnesses at the hearing, apparently declining to even *try* to bring witnesses to the hearing for live testimony, making it impossible for the Hearing Board to accurately gauge their credibility. This is particularly egregious in light of Investigator Broussard's *knowledge* that the witness statements in the packet provided to the Hearing Board were not reliable, as evidenced by, among other things, one witness disclaiming any knowledge of a quote that was falsely attributed to them. In addition, by summarily discarding and altering Plaintiff's proposed questions, with no opportunity for Plaintiff to address any issues therewith, Tulane further deprived Plaintiff of his right to question witnesses.

d.    Tulane failed to provide Plaintiff with meaningful notice of the charges against him at a meaningful time. Roe met with Ms. Rodriguez for her procedural review regarding the charges on April 7, 2017, but rather than notifying Plaintiff, Tulane simply began investigating the allegations with Ms. Mullaly interviewing Roe and taking her statement on April 26, 2017. Even still, Tulane did not provide Plaintiff with any notice until May 10, 2017 and did not provide him with adequate information regarding the nature of Roe's allegations for months, during which time Tulane actively investigated the case, including interviewing at least one

witness before Plaintiff was even informed of the procedural protections that he would allegedly be afforded.

e.  Tulane failed to treat Plaintiff as having not violated the Code unless and until he was ultimately adjudicated as such. Tulane's presumption of guilt, rather than innocence, was evidenced by, among other things, Tulane telling Plaintiff multiple times in response to legitimate concerns he raised about the process, that he should address those concerns "on appeal", clearly indicating the pre-determined nature of the finding of responsibility.  Tulane further breached its promise by incorrectly instructing the Hearing Board that Plaintiff could be found responsible for the charge if they believed that he *intended* to violate the Code, rather than needing to find by a preponderance of the evidence that Plaintiff *did* violate the Code.

170.    Pursuant to Tulane's "Hearing Board Process and Reported Victim/Complainant Rights" document, which was provided to Plaintiff by Tulane during Tulane's investigation:

a.  "The investigator synthesizes [all available] information into a report that neutrally summarizes the results of his or her investigation" and includes "statements from both parties and any witnesses;"

b.  During the Hearing, after the "plea" section, there will be a "summary of the [Hearing Board] report;" and

c.  During the Hearing, after the complainant and respondent provide their testimony, there will be witnesses present, who will be subject to live questioning.

*See* Exhibit "B."

171.    Tulane violated the hearing procedures as set forth in this document, because, by way of example, and not limitation:

a.  The Hearing Board Report was not neutrally written, but rather, was deliberately skewed in favor of the complainant and against the respondent for the purpose of producing a finding of responsibility.  Not only did Tulane impermissibly alter Jane Roe's statements over time to enhance her credibility and consistency, it also included purported witness statements that would corroborate Jane Roe's claims, that **at least one witness denied ever saying**. By failing to follow up with certain witnesses to obtain more information that may not have been beneficial to Roe's account and including incomplete evidence and witness statements in the Hearing Board Packet, Tulane failed to collect all available information and breached its promise of neutrality.

b.  At the hearing, no summary of the Report was presented.  Instead, the hearing Chair, Ms. Rodriguez, simply asked the Board members whether they had read the Report and then immediately moved on to the next step.  The Board was not asked whether they read the addendum to the report, which contained Plaintiff's supplemental statement that was timely submitted by Plaintiff in accordance with Tulane's deadline, but belatedly provided to the Hearing Board.  Further, the fact that the Hearing Board members asked no questions during the entire proceeding, and appeared not to be familiar with certain issues that arose during the hearing, strongly indicate that the Board members did not thoroughly review the report and were not properly trained.

c.   As explained herein, Tulane's refusal to have any witnesses appear at the hearing to present their testimony live and answer questions in the presence of the parties and Hearing Board members was a gross departure from the process delineated in this hearing procedures document, as well as all others provided to the parties and applicable to the 2016-2017 Code. Tulane's failure to follow its own procedures, and the process that Tulane had informed Plaintiff it would be utilizing, materially deprived Plaintiff of the ability to meaningfully question any witness or have their credibility judged by the Hearing Board and demonstrates a blatant disregard for Plaintiff's rights.

172.    In addition to the repeated, material, prejudicial violations of its own policies, Tulane also violated federal regulations governing the process by which colleges and universities must address allegations of sexual misconduct.  By way of example, and not limitation:

a.  Federal regulations promulgated under the Clery Act require universities to adopt policies and procedures for sexual misconduct disciplinary proceedings that will provide for "a prompt, fair, and impartial process from the initial investigation to the final result." 34 CFR 668.46(k). The regulations specify that a "prompt, fair, and impartial proceeding" includes a proceeding that, among other things, is conducted in a manner that "is consistent with the institution's policies and transparent to the accuser and accused," and provides timely and equal access to "any information that will be used during informal and formal disciplinary meetings and hearings." 34 CFR 668.46(k)(3).  Tulane violated the regulations when it refused to provide Plaintiff with Roe's original interview statement or any substantive description of what occurred during her in-person interview with Investigator Broussard just a couple weeks before the hearing, and when it refused to provide the written questions and answers as between the witnesses and Investigator Broussard.

b.  Furthermore, according to the Code, during Tulane's appeal process, the University allows the complainant to submit a response to the respondent's appeal, and in appeals alleging procedural error, allows the Investigator and/or Director of Student Conduct to submit "documents and information" in response

to the alleged errors, none of which is provided to the respondent, in violation of the requirement that Tulane provide "any information that will be used during informal and formal disciplinary meetings and hearings."

## Tulane Skews Its Process in Favor of Complainants

173. On information and belief, the 2016-2017 Code was in part a product of two separate federal directives issued in 2011 and 2014, respectively.

174. On April 4, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague" letter ("DCL"). The letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

175. Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

176. The DCL, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy and "minimize the burden on the complainant".

177. On April 19, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* (the "2014 Q&A").

178. Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

179.    In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014), available at https://obamawhitehouse.archives.gov/sites/default/files/docs/report_0.pdf.  The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could therefore initiate investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

180.    In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.  *See* Testimony of Catherine E. Lhamon, Assistant Secretary Office For Civil Rights, U.S. Department Of Education                    (June                    26,                    2014), https://www2.ed.gov/about/offices/list/ocr/correspondence/testimony/20140626-sexual-violence.pdf.

181.    To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted *over five hundred* investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited February 10, 2021).

182.    The DCL and OCR put considerable pressure on universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education

noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." *Presumed Guilty: College men accused of rape say the scales are tipped against them,* Chronicle of Higher Education, September 1, 2014.

183.    Indeed, a 2014 white paper issued by the Association of Title IX Administrators (ATIXA), titled, *Equity is such a Lonely Word*, functionally directed colleges to tilt their investigations in favor of accusers – in particular, female accusers:

> [C]ampuses for so many years considered only (or primarily) the rights and situation of the accused. Thus, equity ends up feeling like a shift to victim's rights, even though it is not. Ultimately, the pendulum should shift to the middle, rather than to either party, but ***because victims have been historically been accorded 3/5 of the rights of an accused individual (or less), and victims are typically women, equity may require institutions to recalibrate the pendulum*** to right the historical imbalance.

*Id*. (emphasis added)

184.    On information and belief, Tulane joined ATIXA in or around 2016, the year before it would adjudicate Jane Roe's claims against Plaintiff.

185.    Moreover, at least as early as the 2014-2015 school year, Tulane substantially revised its student disciplinary procedures under its Code of Conduct.  The 2014-2015 Code, and versions thereafter, contained significantly reduced procedural protections for accused students by, for example, reducing the burden of proof from clear and convincing evidence to a preponderance of the evidence standard. On information and belief, Tulane implemented these revisions out of concerns about its ability to continue receiving federal funds.

186.    Along with pressure from the federal government, Tulane experienced pressure from its own student community to respond aggressively to complaints of sexual assault and to mete out severe discipline to those found responsible for such acts.

187.    For example, in April of 2015, students participating in Sexual Assault Awareness Month sent e-mails to Tulane's president, Michael Fitts, concerning what students perceived as the administration's tepid response to the events planned that month. The message the students sent was clear and unambiguous: "your failure to acknowledge the effort to fight sexual assault speaks to your inactivity and neglect to this issue that is plaguing Tulane University students." *Students call for recognition for Sexual Awareness Month from the administration*, Tulane Hullaballoo (Apr. 8, 2015), available at https://tulanehullabaloo.com/2107/news/students-call-for-recognition-for-sexual-assault-awareness-month-from-the-administration/. Said one student: "We want to call on Tulane University's administration to reform how they process sexual assault through Student Conduct, so that survivors are not left facing those who assaulted them every day on campus[.] [We need to] provide more sensitivity training with TUPD so they are working appropriately with survivors, **putting them and their needs first**." *Id*. (emphasis added).

188.    With the backdrop of students openly expressing their displeasure with what they believed was Tulane's "inactivity and neglect" around issues of sexual assault, Tulane hired a Title IX Coordinator, Meredith Smith. On information and belief, the decision to hire Ms. Smith was motivated by a desire to quell student criticism that the University was not taking incidents of alleged sexual violence seriously enough. Ms. Smith began her tenure as Tulane's Title IX Coordinator in 2016.

189.    As the Title IX Coordinator, Ms. Smith was, at all times relevant to this litigation, responsible for overseeing Tulane's prevention of and response to alleged sexual harassment and violence, as well as overseeing University compliance with relevant state and federal laws.

190.    Ms. Smith – a published author and speaker on topics related to campus sexual violence against women, had a vested interest in appeasing the demands of vocal student activists and ensuring that, under her tenure, Tulane appeared tough on alleged sexual assailants.

191.    On information and belief, at the beginning of her tenure, Ms. Smith was instrumental in orchestrating Tulane's 2016 "book project" for the incoming freshman class, in which all newly admitted students are assigned a common book to read the summer before matriculation and then discuss it in their new student seminar classes in the fall.  Under Ms. Smith's guidance, the assigned book was *Asking For It: The Alarming Rise of Rape Culture – and What We Can Do About It*, by author and activist Kate Harding.

192.    Ms. Smith also played a major role in organizing a series of "Shifting the Paradigm" events on campus related to the book project, with workshops and presentations for students and administrators focused on topics such as Title IX, and "gender-based sexual violence," culminating in Ms. Harding's lecture about the book and "rape culture in the US."

193.    Among the themes in Ms. Harding's book is the assertion that our current system of education focuses on "how women can avoid rape, not how men can not rape," and the idea that because the media has to appear balanced, it "creates biases against women and perpetuates rape myths." Tulane Reading Project Webinar on "Asking for It" by Kate Harding (available at https://www.youtube.com/watch?v=JQX2IN-nFmQ).

194.    Under Ms. Smith's leadership, Tulane's Title IX-related materials are rife with references to "rape myths" and "rape culture," which is a term coined in the 1970s that is generally understood to describe the concept that society blames female victims of sexual assault and normalizes male sexual violence. The rape culture narrative, and Ms. Harding's book, emphasize that victims should be believed, including by asserting that false reporting is

extremely rare, and eschewing any form of what is considered "victim-blaming", which is often interpreted as questioning any aspect of an accuser's story, credibility, or motivations.

195.    On September 19, 2016, Ms. Smith gave a presentation in which she impressed upon attendees the idea that 1 in 5 women will be sexually assaulted by the time they finish college, and remarked, "This is why we don't ignore what's going on on our college campuses." *University Investigation 101*, "Shifting the Paradigm" (available at https://www.youtube.com/watch?v=_-Y8had-FDw.)

196.    Indeed, from 2016 to the present, Ms. Smith has regularly given presentations to the Tulane student and administrator community emphasizing that 1 in 5 women will be sexually assaulted by the time they finish college, and that through Tulane initiatives such as "Shifting the Paradigm" and "Wave of Change," Tulane is committed to believing survivors and showing that sexual violence will not be tolerated.

197.    In fact, as recently as February 2, 2021, Ms. Smith posted on social media addressing the surprise expressed by members of the public concerning a female politician's claim of being a survivor of assault, stating "at this point, the surprise is when a woman (and a college educated one) is NOT a survivor."   In other words, Tulane's Title IX coordinator unapologetically believes that *a majority* of women are sexually assaulted in college.

198.    On information and belief, from the 2015-2016 school year to the present, each year, the number of complaints alleging sexual misconduct, the number of disciplinary proceedings initiated, the percentage of accused students found responsible, and the percentage of students who are suspended or expelled, have all increased dramatically.

199.    On July 1, 2017, an anthology titled *Addressing Violence Against Women on College Campuses* was published, with a chapter titled, *Title IX Investigations and*

"*Rehabilitated Schools*," authored by Meredith Smith. In the chapter, Ms. Smith detailed OCR's 2014-2016 crackdown on higher education institutions concerning sexual misconduct policies and explained that the DCL seemingly indicated that the only way to properly address sexual violence was to "punish it out of our communities." She explained:

> Disciplinary outcomes have become the most reliable way to tell if a school is taking sexual violence seriously by examining its expulsion rates . . . .   In the course of my work in Title IX, students, staff and faculty repeatedly ask about our institution's expulsion rate: if they are perceived to be too low, it is taken as a canary in the coal mine-the proof that the school is failing. And if your community believes you are failing, it stands to reason that the OCR might feel the same way, too.

Meredith M. Smith, *Title IX Investigations and* "*Rehabilitated Schools,*" in ADDRESSING VIOLENCE AGAINST WOMEN ON COLLEGE CAMPUSES, 271, 278 (Catherine Kaukinen et al., eds. 2017).

200.    Moreover, notwithstanding the promises of an impartial investigation and adjudication without any presumption of wrongdoing contained in Tulane's Code, the Title IX training materials Tulane has used over the years to educate and train those who make decisions with regard to the investigation, adjudication, and appeal of cases involving sexual assault allegations emphasize that alleged victims must be believed and supported, and that the trauma of an alleged incident often causes victims to forget the details of an event and to make inconsistent statements regarding what occurred, or to respond and act in counter-intuitive ways. Such Title IX training materials were heavily relied upon by Tulane beginning in 2015 and continuing through the 2016-2017 timeframe, and on information and belief, all those who participated in John Doe's disciplinary proceeding, including all members of the Hearing Board, were trained under this regime that tilts the scale against the accused student, often in trainings conducted by Ms. Smith. On information and belief, Ms. Smith also plays an active role in the evidence-gathering phase of a Title IX investigation, weighing in on decisions about who to

interview, what follow-up questions to ask, and which facts are important, or indeed, are even relevant.

201.     In the Spring of 2017, Tulane conducted a Sexual Misconduct Climate Survey ("Sexual Misconduct Survey") of its undergraduate and graduate students for the purported purpose of gauging the frequency and degree of sexual misconduct among the student population, motivated in part by a belief that sexual assault is underreported. Among other problems, the Sexual Misconduct Survey utilized very broad definitions of the conduct it was seeking to measure, such as including any unwanted sexual touching in the definition of sexual assault, framed the survey questions in a highly suggestive manner, and oversampled conduct by including misconduct that occurred anywhere or at any time since the student had enrolled at Tulane. *See Tulane Climate Survey: Executive Report and Action Plan*, Tulane Univ. (Jan. 31, 2018),                                available                                at https://tulane.edu/sites/tulane/files/WaveofChangeExecutiveReportActionPlan.pdf.   It is during this same timeframe that Jane Roe decided for the first time to report her many-months-old allegations regarding John Doe to Tulane.

202.     Ms. Smith, who has often repeated the notion that false claims of sexual assault almost never occur and, instead, widespread underreporting is prevalent, helped to design the Sexual Misconduct Survey. Notably, in February of 2017, Ms. Smith was the first University official with whom Roe discussed the incident that had occurred between her and John Doe.

203.     During the Fall of 2017, the semester during which John Doe's hearing and appeal were adjudicated, Tulane students continued their activism on campus, pressuring the administration to take more aggressive action to end sexual violence, and becoming increasingly agitated that the University had yet to release the data from the Sexual Misconduct Survey.

Finally, on January 31, 2018, Tulane released the data: the survey results concluded that an astonishing 41% of female undergraduate students had reported experiencing sexual assault since enrolling at Tulane, and an astonishing 18% of undergraduate male students reported experiencing sexual assault since enrolling at Tulane. By vastly overstating the problem, the University justified its pattern of depriving accused students of procedural protections in the name of aggressive enforcement and severe punishment.

204.    For example, at a town hall event scheduled to announce the survey results, students angrily questioned President Fitts, Ms. Smith, and Tania Tetlow, the Senior Vice President and Chief of Staff to the President, about why the University had not done more to address sexual assault on campus. Responses included: Ms. Smith stating that most of those found guilty are expelled; Ms. Tetlow stating, "We have no problem expelling people and we do not care about tuition money" and "Let's be clear: you will be punished if you violate someone else," while touting the increase in reporting numbers; and President Fitts stating that many assaults are never reported, but if students do make the decision to come forward, there will be swift action. *See* "Students press administration over release of sexual assault town hall results," Tulane Hullabaloo, January 31, 2018.  (While these statements were made after the decision in Plaintiff's case, they clearly exemplify the attitude of Tulane's administration as it had been developing for years).

205.    By the time of John Doe's Student Conduct Hearing, Tulane had fully immersed itself in a process designed to promote the needs of those alleging sexual misconduct at the expense of implementing any semblance of adequate due process protections for the accused or utilizing the procedural protections that Tulane promises to its students. As explained by Tulane's own former investigator, in the years leading up to Plaintiff's Student Conduct Hearing,

the process had become increasingly skewed against respondents, and against male respondents in particular.

206.    Indeed, Tulane has doubled-down on its efforts to provide threadbare due process rights to accused students, even though the DOE has been encouraging schools to increase such protections since 2017. For example, on September 7, 2017, DOE Secretary Betsy DeVos vowed to replace the "failed system," stating that "one person denied due process is one too many." Ms. DeVos continued, "Every student accused of sexual misconduct must know that guilt is not predetermined," and explained that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination*." Secretary DeVos: Proposed Title IX Rule Provides Clarity for Schools, Support for Survivors, and Due Process Rights for All*, U.S. DEP'T OF EDUC. (Nov. 16, 2018), *available at* https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

207.    On September 22, 2017 – just four days before John Doe's disciplinary hearing – OCR withdrew the 2011 Dear Colleague Letter and the 2014 Q&A. In their place, OCR issued the "September 2017 Q&A on Campus Sexual Misconduct," which prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents. *See* https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

208.    The 2017 Guidance also requires, among other things, that (i) a person free from actual or perceived conflicts of interest or bias lead sexual misconduct investigations; (ii) training materials or decision-making techniques that "apply sex stereotypes or generalizations" should be avoided to ensure a fair and impartial investigation; (iii) all rights and opportunities made available to complainants must be made available to respondents; and (v)

those issuing sanctions must consider the impact of separating a student from his or her education, and the sanction should be proportionate to the violation.

209. However, Tulane resisted, issuing a statement from Ms. Smith and Ms. Tetlow on October 2, 2017 –on the very day that the Office of Student Conduct informed Plaintiff that the Hearing Board had decided to sanction him with expulsion – that the University had "concerns" about the DOE's "new guidance on campus sexual assault," and announcing the University's commitment to the original Dear Colleague Letter.

210. Further, when the DOE published its notice of proposed rulemaking in November of 2018 to promulgate new Title IX regulations requiring additional procedural protections, such as the right to cross-examination of complainants and witnesses, Tulane submitted a public comment in opposition, in which Ms. Smith sharply criticized the due process protections proposed by the DOE including the very notion of a hearing board process. For example, Ms. Smith stated that "[p]rior to July 1, 2017, Tulane employed a hearing board model," but that Tulane had revised its disciplinary process "because of critical concerns with the workability of a hearing board based on the adversarial, court-like nature of hearings, the training needs to keep hearing board members fresh in their skills, the scheduling challenges and time delays associated with a multi-participant hearing board paradigm, and the challenges of recruiting a robust pool of volunteer board members and advisors."  Moreover, Ms. Smith made clear that her hostility towards providing a meaningful and legitimate hearing board process is primarily the availability of cross-examination during such a proceeding, stating: "We do not agree with the DOE's continued reliance on a quotation from 1904 about cross-examination being the greatest engine for discovery." Ms. Smith described her concern for providing such procedural protections with:

"Many victims will likely conclude that going through an adversarial hearing is simply not worth it."

211.    True to her word, in the Summer of 2020, Ms. Smith posted a lengthy and bizarre social media video, under the account name "tulanetitleix", wherein she ***began to cry—literally, with actual tears—over the notion of having to implement the Department of Education's revised Title IX regulations***, which were designed to restore the due process rights that colleges and universities had largely cast aside in response to the Dear Colleague Letter (and which Smith disingenuously described as having "fallen out of the sky", despite the lengthy procedural steps that preceded their implementation, including a full notice-and-comment period before final adoption).

212.    Plaintiff's case and others like it in recent years have shown that Tulane's institutional interests, and its embrace of a patently biased Title IX Coordinator who is openly hostile to the notion of due process, have interfered with the impartiality of its investigations and adjudications of allegations of sexual misconduct, demonstrating at a minimum, a bias in favor of complainants and against the accused, in violation of Tulane's express promise under the Code to provide a "neutral", "impartial", and "non-adversarial" process and to presume respondents innocent until proven otherwise by a preponderance of the evidence.

213.    Indeed, numerous times throughout Plaintiff's disciplinary process, Tulane made clear that it presumed Plaintiff guilty, repeatedly telling him that he can "appeal" Tulane's myriad missteps after the fact, rather than trying to actually address and remedy them.

214.    Moreover, a disciplinary process that does not include adequate due process protections and is biased toward finding an accused student responsible disproportionately affects male students at Tulane, as nearly all of the charges and investigations that Tulane

pursues involve accused students who are male, the process is intended to discriminate against male students. Tulane's action in that regard, combined with its numerous procedural violations throughout the investigation and adjudication of Plaintiff's case, indicate an abdication of Tulane's obligations of good faith, fair dealing, and fundamental fairness.

## PLAINTIFF'S DAMAGES AND IRREPARABLE HARM

215.   As a result of Tulane's repeated, material, procedural and substantive missteps, Plaintiff was subjected to a process that failed to comport with Tulane's contractual obligations or the principles of good faith and fair dealing.

216.   As a result of Tulane's repeated, material violations of its contractual obligations to Plaintiff, Plaintiff was denied his rights under the policies and was prevented from being able to fully and adequately meet the charges against him in order to properly defend himself.

217.   As a result of Tulane's repeated, material violations of its contractual obligations to Plaintiff, Plaintiff was wrongly found responsible for sexual assault and expelled from Tulane through a process that was deliberately skewed in favor of complainants and against respondents (particularly, against male respondents).

218.   As a result of Tulane's repeated, material violations of its contractual obligations to Plaintiff, Plaintiff was deprived of the benefits of his tuition payments to Tulane and was forced to incur significant costs in defending himself and addressing the fallout of Tulane's improper actions, including having his education delayed and improperly interrupted.

219.   As a result of the faulty finding and excessive sanction, Plaintiff was deprived of the benefits of a Tulane education and precluded from the ability to attend a school of similar quality, limiting Plaintiff's future educational and career opportunities, causing Plaintiff economic and other damages.

220.   As a result of the faulty finding and excessive sanction, Plaintiff's academic file is forever marred by a false and highly damaging finding of sexual assault and expulsion.

221.   As a result of the faulty finding and excessive sanction, Plaintiff has been wrongly branded as a sexual assailant, and has suffered and will continue to suffer significant stigma and reputational damages associated with such a characterization.

222.   Plaintiff's career plan before this incident was to go into medicine.  According to an experienced graduate school admissions consultant retained by Plaintiff, a finding of sexual misconduct such as the finding placed on Doe's record by Tulane creates an almost insurmountable barrier to Medical School admission, regardless of the merits of the applicant. Tulane's actions to date have, therefore, delayed Plaintiff's education, deprived him of educational opportunities, and effectively precluded Plaintiff from being able to pursue the career of his choice, resulting in considerable damages and economic losses.

223.   Moreover, absent a permanent injunction ordering Defendant to remove the finding of responsibility and sanction of expulsion from Plaintiff's permanent educational record, Doe will suffer irreparable harm. Without appropriate redress, the incorrect and unfair outcome of Tulane's disciplinary proceeding will continue to compromise his educational and career prospects, including preventing him from gaining admission to graduate school or becoming a licensed professional.  There is no adequate remedy at law for these injuries.

## COUNT I
## Breach of Contract

224.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

225.    At all times relevant hereto, a contractual relationship existed between Tulane and Plaintiff by virtue of Plaintiff's enrollment at Tulane and as defined by and through Tulane's policies and procedures governing the student disciplinary system, including but not limited to the Code of Conduct.

226.    Through the documents it publishes and provides to students, Tulane makes express and implied contractual commitments to students involved in the disciplinary process and/or the investigation of potential violations of the Code.

227.    Louisiana law recognizes that the relationship between a student and a college is contractual in nature, and the terms of the Student Handbook, policies, and similar documents become part of that contract.  *See, e.g., Babcock v. New Orleans Baptist Theological Seminary*, 554 So.2d 90, 96-97 (La. App. 4 Cir. 1989) ("[S]chool publications given to students were part of the terms of a 'contract' between a school and its students."); *I.F. v. Administrators of Tulane Educational Fund*, 131 So.3d 491, 498 (La. App. 4 Cir. 2013) ("[W]e find that I.F. and Tulane were in a contractual relationship during I.F.'s attendance at Tulane.").

228.    In addition, implied in every contract is the covenant of good faith and fair dealing.  *See, e.g., Brill v. Catfish Shaks of Am., Inc.*, 727 F. Supp. 1035, 1039 (E.D. La. 1989) ("In Louisiana the requirement that all contracts must be performed in good faith is codified in the Civil Code articles relative to obligations.").

229.    Based on the aforementioned facts and circumstances, Tulane created express and implied contracts when it offered, and Plaintiff accepted, admission to Tulane, and when Plaintiff paid the required tuition and fees.  The terms of those contracts were set forth in Tulane's Code of Conduct and its various Title IX policy documents provided during Plaintiff's enrollment.

230.   As set forth in detail above, Tulane breached its express and/or implied agreement(s) with John Doe, because, by way of example:

    a.   Tulane's investigation was biased from the start, with the interview summaries deliberately edited (and apparently, in part, fabricated) by the investigators for the purpose of supporting Jane Roe and making her appear more credible;

    b.   Tulane's investigation was not impartial and was not thorough, with Tulane failing to collect all relevant evidence and, indeed, failing to follow-up with witnesses and/or disclose information in witness statements that did not support Roe's version of events;

    c.   Tulane failed to provide Plaintiff with meaningful notice of the charges against him at a meaningful time;

    d.   Tulane's process was highly adversarial;

    e.   Plaintiff was denied access to relevant materials and witness statements;

    f.   Plaintiff was denied information that would have been highly relevant to the issue of bias on the part of a Hearing Board member;

    g.   A biased Hearing Board member failed to recuse himself;

    h.   Tulane violated numerous provisions of its hearing procedures, including, failing to review the summary of the case, failing to present witnesses at the hearing, and failing to permit an opportunity for the parties and the Board to question the Investigators;

    i.   Tulane's investigator opened and closed the hearing by providing a false and incorrect statement of the standard of evidence to be applied in making the determination of Plaintiff's guilt, permitting the Board to find him responsible if he even *intended* to violate the Code, rather than properly instructing the Hearing Board that Plaintiff could only be found responsible if the evidence showed that he had actually violated the Code;

    j.   Tulane functionally precluded Plaintiff from being able to question his accuser and the witnesses by disregarding or altering Plaintiff's questions, without warning and without giving Plaintiff an opportunity to revise any purportedly problematic questions;

    k.   On information and belief, Tulane skipped over the necessary sanction review and approval process; and

l.   Tulane's appeal process was completely opaque: Plaintiff was not advised of the appellate board members reviewing his appeal, or of the role or nature of anyone else participating in the appeal process or supplying information to the panel, was given no explanation whatsoever for the denial of the appeal, and the appeal decision was communicated to him by a random investigator with seemingly no authority over such important matters.

231.   Further, as with all other universities that receive federal funding, Tulane is required by the Clery Act to compile and publish an Annual Fire Safety and Security Report ("ASR"), which among other things, is required to describe the policies and procedures that the university will follow in disciplinary actions responding to reports of sexual misconduct. Accordingly, the statements of written policy in Tulane's ASR also form the basis for the contractual obligations Tulane has to its students, and upon which students like John Doe are supposed to be able to rely for transparency in understanding the security protocols and disciplinary process at a school, which if deemed inadequate, a student may otherwise choose not to attend.

232.   In Tulane's 2016 ASR describing its hearing board process, Tulane promised that its disciplinary proceedings will be "prompt, fair, and impartial." Tulane breached that obligation by failing to do any of the things that the Clery Act regulations identify as the hallmarks of a proceeding that falls within the definition of "prompt, fair, and impartial," notwithstanding that Tulane parrots the language of the regulations verbatim in its ASR. *See* 34 CFR 668(k)(3). Namely, Tulane breached its obligations in the following non-exclusive ways:

a.   Tulane failed to conduct the proceeding in a manner that was consistent with its policies and transparent to the accuser and the accused by, among other things, materially deviating from its hearing board policies and procedures by refusing to provide for live witness testimony and questioning before the Hearing Board, and refusing to disclose critical information about the substance of the witness statements and how the process was being handled at every stage of the investigation, adjudication, and appeal.

b. Tulane failed to conduct the proceeding in a manner that provided timely and equal access to any information that would be used during informal and formal disciplinary meetings and hearings by refusing to provide timely access to all witness statements that would be used during the hearing and, on information and belief, failing to ever provide access to information used on appeal, such as any statements submitted by Roe, the Investigator, or the Director of Student Conduct.

c. Tulane failed to provide a proceeding that was conducted by officials who do not have a conflict of interest or bias for or against the accuser or the accused.

d. Tulane failed to provide sufficient notification of the result of the proceeding because the Hearing Board outcome did not initially include the rationale for the result, thereby delaying Plaintiff's opportunity to prepare his appeal, and the rationale for the appeal result was never provided to Plaintiff.

233.    As a proximate and foreseeable consequence of the foregoing breaches, John Doe has sustained and will continue to sustain damages, including, without limitation, severe stigma, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

234.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as a permanent injunction vacating the finding and sanction as void and invalid, due to Tulane's multiple breaches of its own policies and procedures, and removing any such notations from Plaintiff's student records.

## <u>COUNT II</u>
### <u>Breach of Implied Covenant of Good Faith and Fair Dealing</u>

235.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

236.    As set forth in detail above, Tulane violated the covenant of good faith and fair dealing that is implied in every contractual relationship under Louisiana law by, *inter alia*, engaging in a skewed, one-sided, adversarial and deficient process that, despite Tulane's

contractual obligations to the contrary, was designed to find Plaintiff responsible as the male accused and to impose the harshest sanction possible.

237.    Indeed, Tulane's own investigator apprised Plaintiff's advisor that Plaintiff should consider withdrawing from Tulane altogether rather than going through the Hearing Board process, as the Hearing Board process consistently found male students accused of sexual misconduct responsible and imposed the harshest sanctions possible.

238.    Further, as detailed above, Tulane's institutional interest in appearing tough on those accused of sexual misconduct and meting out harsh punishments, no matter the circumstances of the allegations, in order to appease federal regulators and its own student body, and to validate the objectives of the University administrators overseeing the disciplinary process, instilled a motive to skew the process against Plaintiff in order to ensure Tulane's desired outcome: that Plaintiff be found responsible for sexual assault.

239.    In that regard, notwithstanding Tulane's decision to proceed with adjudicating Plaintiff's case through the Hearing Board process (albeit one that did not comply with the 2016-2017 Code), **Tulane's own Vice President of Student Affairs, <u>Dusty Porter, acknowledged in May of 2017—four months *before* Plaintiff's Hearing—that Tulane's Hearing Board process was flawed and unreliable</u>**.

240.    Specifically, according to the minutes from the May 1, 2017 meeting of the Tulane University Senate, addressing proposed changes to Tulane's 2017-2018 Code, Porter stated that "hearings are an awful and traumatic experience for students, whether those charged or those offended" and that "**It's probably better for a trained professional to do this than a committee of non-professionals.**"  **Porter acknowledged that he "has seen these procedures in action, and he very much recommends the role of professionals here."**

241.    Tulane's insistence on applying the 2016-2017 procedures to Plaintiff's disciplinary process, despite the proceeding taking place during the 2017-2018 school year, and despite Tulane's prior, public acknowledgment that its Hearing Board procedures were traumatizing, unreliable, and conducted by insufficiently knowledgeable individuals, is egregious and representative of bad faith.

242.    Worse still, Tulane did not even faithfully apply the Hearing Board process that the 2016-2017 Code actually required and, instead, utilized procedures that made the process more unfair and more unreliable, such as failing to provide for live witness questioning before the Hearing Board, demonstrating bad faith and blatant disregard for Plaintiff's rights.

243.    Moreover, regardless of which process is better – and for whom – by applying some sort of hybrid process that did not comport with either the 2016-2017 Code or the 2017-2018 Code, Tulane breached its covenant of good faith and fair dealing.

244.    On information and belief, no 2016-2017 Code proceeding conducted during that academic year was conducted using the process and procedures Tulane utilized for Plaintiff's adjudication, where rather than appearing before the Hearing Board to answer questions live, witnesses were instead presented in advance with questions in writing, to be answered in writing, which were then simply read to the Hearing Board outside of the witness' presence.

245.    Tulane demonstrated bad faith and ill will towards Plaintiff throughout the process by intentionally depriving him of his rights, including but not limited to his right to access all statements submitted during the conduct process; his right to a thorough and impartial investigation; his right to an unbiased Hearing Board; and his right to question witnesses at the hearing, which was exacerbated by Tulane's failure to provide Plaintiff with notice of any

claimed deficiencies in the questions Plaintiff had submitted in advance for Roe or any of the other witnesses.

246.    Furthermore, Tulane exhibited ill will towards Plaintiff throughout the process because each time that Plaintiff tried to point out and remedy a flaw in the process—such as Tulane's failure to provide Jane Roe's original statement, or the refusal to ask his proposed questions of Roe or other witnesses—Tulane disregarded his concerns and simply advised him that he could "appeal" the decision if he wished to later.

247.    Not only was this indicative of Tulane's presupposition and/or intent that Plaintiff would be found responsible all along, regardless of what happened during the process, it also unfairly and prejudicially shifted the burden to Plaintiff to prove his innocence.  In that regard:

 a. There are only limited grounds for appeal under the Code, and, when evaluating the appeal, the appellate board is instructed to make all inferences in favor of the *non*-appealing party.  In other words, the burden shifts from the University proving responsibility by a preponderance of the evidence, to Plaintiff having to prove that the error complained of "was so great that it was likely to have impacted the [finding]," and, in doing so, Plaintiff must overcome a *presumption* that the finding was correct.

 b. Tulane's knowing, deliberate refusal to address errors during the process made it nearly impossible for Plaintiff to have the problems adequately addressed after the fact via an appeal.  In this way, Tulane shirked its obligations under its policies and twisted the applicable standards to skew the process against Plaintiff and leave him with no genuine opportunity for redress.

248.    Moreover, Tulane knowingly deprived Plaintiff of his rights under relevant federal law, and in investigating and adjudicating the allegations made against him, Tulane knowingly disregarded promises the University made as to the disciplinary process it would follow.  To wit: Tulane unequivocally stated in its 2016 ASR, as well as its 2017 ASR (and, on information and belief, every ASR that Tulane has published to date), that Tulane's disciplinary proceedings "will be conducted in a manner that is consistent to Tulane's policies and is

transparent to the complainant and the accused" and that "Tulane will provide timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during formal and informal disciplinary meetings and hearings." However, Tulane refused to comply with these dictates of transparency and timely access to information by, among other things, refusing to provide Plaintiff with any information as to the content of Roe's original statement to Investigator Mullaly, as well as that of Roe's subsequent statement to Investigator Broussard; withholding witness responses to follow-up questions; and failing to provide access to any statements or materials submitted during the appeal process.

249.   As such, Tulane's actions not only violated the Clery Act and the promises that Tulane made to Plaintiff in its various policies, but Tulane's statements in its ASR clearly show that Tulane is *aware* of the requirements, including specifically, transparency, and Tulane knows the type of process that the University *is supposed to be providing*, but notwithstanding, Tulane refused to apply its policies and procedures in a manner that would achieve those objectives.

250.   The fact that Tulane knowingly flouted the policies required by federal law – while the University actively represents to its students and the public that it is in full compliance – demonstrates bad faith and a desire to pay lip-service to its obligations while actually working to undermine them, in breach of the covenants of good faith and fair dealing.

251.   As a proximate and foreseeable consequence of the foregoing breaches, John Doe has sustained and will continue to sustain damages, including, without limitation, severe stigma, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

252.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements,

as well as a permanent injunction vacating the finding and sanction as void and invalid, due to Tulane's refusal to perform its contractual obligations in good faith, and removing any such notations from Plaintiff's student records.

## COUNT III
## Detrimental Reliance

253.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

254.     In the event this Court finds no contractual relationship, Plaintiff alleges, in the alternative, that Tulane is liable to him for detrimental reliance.

255.     Plaintiff justifiably relied to his detriment on Tulane's promise that it would act in good faith towards him, and in compliance with its stated policies and procedures, as a student enrolled at the University. To that end, Tulane's Code and other written policies constitute representations and promises that Tulane should have reasonably expected to induce action or forbearance on the part of Plaintiff.

256.     Tulane expected or should have expected that Plaintiff would accept its offer of admission, incur tuition and fees, and forego his opportunity to attend other colleges based on the University's express and implied promises that, among other things, Tulane would treat Plaintiff in a fair, impartial, and unbiased manner and provide certain procedural protections if Plaintiff were ever accused of violating Tulane's policies.

257.     Plaintiff relied to his detriment on these express and implied promises and representations by Tulane.  Plaintiff further justifiably relied to his detriment during the disciplinary process that Tulane would act in good faith to ensure that the University's promises and representations were effectuated, but Tulane's actions and inactions in failing to fairly and impartially investigate and adjudicate Jane Roe's claims against Plaintiff materially undermined such promises.

258.     Tulane knew, or should have known, that Plaintiff would justifiably rely on such promises and representations, which were material inducements to Plaintiff choosing to attend and continue to pay tuition to Tulane.

259.     As a proximate and foreseeable consequence of the foregoing, Plaintiff has sustained and will continue to sustain damages, including, without limitation, severe stigma, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

260.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as a permanent injunction vacating the finding and sanction as void and invalid, due to Tulane's refusal to perform its contractual obligations in good faith, and removing any such notations from Plaintiff's student records.

## JURY DEMAND

261.     Plaintiff demands a trial by jury of all issues presented herein that are capable of being so tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, John Doe, respectfully requests that, after due proceedings are had, the Court:

i.     Without bond, issue a permanent injunction directing Tulane, its employees, agents, successors, and assigns to vacate the finding and sanction issued by Tulane as described herein as void and invalid, and expunge his record related to same to remove any such notations or references from Plaintiff's student records; and

ii.   Enter judgment in favor of Plaintiff and against Tulane in an amount to be determined at trial, together with pre-judgment interest, costs, and attorney's fees; and

iii.   Grant Plaintiff such other or further relief as the Court may deem just and proper.

Dated: February 19, 2021

Respectfully Submitted,

*/s/ Ellie T. Schilling*
Ellie T. Schilling, 33358
Ian L. Atkinson, 31605
**Schonekas, Evans, McGoey
& McEachin, LLC**
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70112
Telephone: (504) 680-6050
Facsimile: (504) 680-6051
ellie@semmlaw.com
ian@semmlaw.com

-and-

Andrew T. Miltenberg, Esq.*
Adrienne Levy, Esq.*
**Nesenoff & Miltenberg, LLP**
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500
amiltenberg@nmllplaw.com
alevy@nmllplaw.com

* *Pro hac vice* application forthcoming

*Attorneys for Plaintiff John Doe*